1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| 9 MIGUEL A. FRANCO, | Case No. 1:12-CV-01267-SMS |
| 10 Plaintiff, | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| 11 v. | |
| 12 CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| 13 | |
| 14 Defendant. | |

15

16    Plaintiff Miguel A. Franco, proceeding *in forma pauperis*, by his attorneys, Rohlfing &

17 Kalagian, LLP, seeks judicial review of a final decision of the Commissioner of Social Security (the

18 "Commissioner") denying his application for disability insurance benefits (DIB) pursuant to Title II

19 of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on

20 the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M.

21 Snyder, U.S. Magistrate Judge.  Following a review of the complete record and applicable law, the

22 Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial

23 evidence.

24 ///

25 ///

26 ///

27 ///

28

1

1  I.     **Administrative Record**

2         A.     **Procedural History**

3         Plaintiff filed an application for disability insurance benefits on July 22, 2009, alleging

4  disability beginning January 25, 2005.  The Commissioner initially denied the claim on May 28,

5  2010.  On July 29, 2010, Plaintiff filed a timely request for a hearing.

6         Plaintiff appeared and testified at a hearing on July 25, 2011.  On September 9, 2011,

7  Administrative Law Judge Jeffrey A. Hatfield denied Plaintiff's application.  The Appeals Council

8  denied review on June 5, 2012.  On August 3, 2012, Plaintiff filed a complaint seeking this Court's

9  review.

10         B.     **Factual Record**

11         On October 17, 2003, Plaintiff (born October 25, 1962) was employed in an auto body shop,

12  coloring, sanding, and buffing cars after they had been painted.  While attempting to repair a garage

13  door so that the business could close that evening, Plaintiff fell approximately twelve feet to a

14  concrete floor when the ladder on which he was standing collapsed.  He first struck his left foot, then

15  landed on his back.  Workers' compensation provided immediate care through industrial physicians,

16  who diagnosed various sprains, strains, and contusions.  Although he remained in pain, Plaintiff

17  worked until January 17, 2005, when he could no longer tolerate the pain and contacted an attorney.

18  Plaintiff was unable to walk, lift heavy objects, or bend forward.  Plaintiff then began an odyssey of

19  chiropractic and traditional medical care that included two ankle surgeries and six back (lumbar

20  spine) surgeries, as well as secondary depression and anxiety.  By the time Plaintiff applied for

21  disability insurance benefits, he had developed painful symptoms of left shoulder impingement

22  syndrome for which he required further surgery.

23         At the agency hearing on July 25, 2011, Plaintiff testified that he was able to bathe himself

24  but that because he could not fully bend down, his wife put on his socks.  He could prepare simple

25  meals and was able to shop from time to time.  Each day, he fed his chickens and pet desert turtles.

26  He played with his granddaughter, working on puzzles or going to the pool, which his doctor

27  recommended as good for his back.  Plaintiff lay down every half hour for fifteen to twenty minutes.

28                                                    2

Plaintiff testified that he spoke and wrote little English, but testified without an interpreter. He had completed the third grade in Guatemala.[1]

Plaintiff was treating his pain with Lyrica and Norco.  Although medication did not eliminate his pain, it helped somewhat.  None of the surgeries that he had experienced had resolved his symptoms.  His shoulder pain left him unable to lift even a glass of water.  Plaintiff testified that he could lift ten to fifteen pounds with his right hand, could sit a maximum of twenty minutes, and could stand from an hour to an hour and forty-five minutes at one time.  Plaintiff could drive, but not for long distances.

Having developed restless leg syndrome, Plaintiff was unable to sleep through the night.  At three or four in the morning, his legs would awaken him, and he would get up and walk, then sit down.  Stress and anxiety also impaired his sleeping; sleeplessness caused more stress and anxiety.

In an October 25, 2009 exertion questionnaire, Plaintiff indicated that he experienced back and left ankle pain, headaches, and tingling in both legs.  He could not bend down or stand for a long time.  Due to back pain, he had to stand in the middle of his meals.  Plaintiff reported that walking a mile took forty minutes and left him exhausted and in extreme pain.  Lifting a gallon of milk or walking a flight of stairs caused back and ankle pain.  Plaintiff reported sleeping six hours nightly and napping three times daily from 45 minutes to an hour.

**Medical History.**  When orthopedist Ronald B. Perelman, M.D., assumed control of Plaintiff's work injuries on January 25, 2005, Plaintiff complained of neck, low back, and left ankle pain.  Examination of Plaintiff's cervical spine revealed bilateral midline palpable tenderness, rated 1+ at paravertebral and trapezius levels.  Extension, lateral flexion and rotation of the cervical spine were markedly limited.  Motion of Plaintiff's shoulders, elbows, wrists, and forearms was normal.  Upper body reflexes were normal, sensation was intact to pinpricks, and strength was full (5/5).

Dr. Perelman's examination of Plaintiff's lumbosacral spine revealed an antalgic gait on the left.  Plaintiff walked on his heels and toes with difficulty.  His pelvis was level and lumbar lordosis was normal.  Midline palpable tenderness was 1+.  Forward and lateral extension and forward

---

[1] Plaintiff told Drs. Freeman and King (*see infra*) that he had completed seventh grade, which was the full course of schooling in Guatemala.

flexion were below normal.  Hip, knee, and ankle motion were normal; lower body strength was full (5/5) in all respects.  Reflexes were normal.  Despite full motion, examination of the left ankle revealed slight plantar and medial tenderness.  Sensation was reduced throughout the lower left extremity.

X-rays of the cervical and lumbosacral spine and the pelvis were within normal limits.  Nonetheless, Dr. Perelman diagnosed a probable herniated nucleus pulposa at L5.  X-rays of Plaintiff's left ankle were normal except for a possible chip fracture of the distal tibia.

On March 7, 2005, physician's assistant Cory Morrison noted that chiropractic treatment and physical therapy were providing minimal help.[2]  An MRI had revealed a moderate disc bulge at S1-S2. On May 5, 2005, Morrison noted that Plaintiff was attending physical therapy and improving.  Noting painful range of motion in the ankle, Morrison referred Plaintiff to pain management with a request for epidurals.

On July 5, 2005, Hessam Azami, M.D., noted that Plaintiff continued to complain of lower back and ankle pain.  He diagnosed neck sprain, lumbar sprain, and ankle contusion.  Plaintiff was to continue physical therapy and use naproxen for pain.

On August 16, 2005, Dr. Perelman observed that Plaintiff's condition had not changed and requested authorization to refer Plaintiff for surgery on his left foot.  Dr. Perelman's examination indicated that Plaintiff had the normal range of motion of the cervical spine, shoulders, elbows, forearms, and wrists; full upper extremity strength (5/5 in all respects); intact upper extremity reflexes and sensation; and no atrophy of the upper extremities.  Although Plaintiff also had full range of motion in his hips, knees, and ankles, the range of motion for his lumbosacral spine was reduced in all respects.  Lateral ligaments of the ankles were tender.  Plaintiff retained normal reflexes and full strength (5/5) in his lower extremities, but demonstrated diffuse hyperesthesia in his lower left extremity.  Plaintiff had mild L5-S1 radiculopathy and mild sensorimotor polyneuropathy.

On October 15, 2005, Dr. Perelman reported that Dr. Kim examined Plaintiff and recommended surgery to remove the distal tibial chip from his left ankle.  Dr. Perelman agreed that

---

[2] Because of poor penmanship and uncertain abbreviations, much of Morrison's reports is indecipherable.

the surgery, which Plaintiff wanted, was advisable as long as Plaintiff's expectations of the surgery were reasonable.  He also noted that Plaintiff had requested a consultation with a back surgeon.

In a December 22, 2005 report, chiropractor Brian K. Padveen, D.C., MQE, noted that Plaintiff was experiencing left ankle pain rated 7/10.  Plaintiff's ankle was swollen, and its range of motion was limited.  His left foot was in an orthopedic boot, and Plaintiff needed crutches to get around.  The pain worsened with pressure, weight bearing, and the weather.  Plaintiff reported using a physical therapy machine at home.

In addition, Plaintiff had constant low back pain rated 5/10 radiating down the left lower extremity.  The toes on his left foot were numb and tingly.  Back pain increased with activities including lifting, bending, twisting, turning, pivoting, climbing, pushing, pulling, standing, walking, and prolonged sitting.  Use of crutches had increased Plaintiff's back pain.  Straight leg raising on the left increased back pain but not radiculopathy.  Nachlas and Yeoman's test provoked lumbosacral pain.  Dejerine's triad and Valsalva's maneuver were positive.  Pinwheel examination revealed hypoesthesia over the S1 dermatome on the left.

Plaintiff also experienced intermittent neck pain radiating to the shoulders, rated 4/10.  Cervical range of motion was limited. The neck pain, which was associated with headaches, was worse in the morning or after lying down.

In late January 2006, Plaintiff experienced a flare-up of his lumbar and cervical back pain.  Plaintiff complained to Dr. Padveen of his right eye's twitching and of difficulty sleeping.  The continued pain was causing anxiety and stress.

In April 2006, Dr. Padveen noted no change in Plaintiff lower back pain radiating to his left leg and reported that Plaintiff was favoring his left ankle, of which the doctor diagnosed internal derangement, possible synovitis and capsulitis.  Noting a 2-3 mm. herniated nucleus pulposus at L5-L6 with mild L5-S1 radiculopathy, Dr. Padveen opined that Plaintiff's limping on his left ankle was damaging his lower back.

In May 2006, Dr. Padveen reported that Plaintiff required immediate orthopedic care of the newly developed anterior compartment syndrome in his left ankle.  Plaintiff continued to experience

lower back problems with radiculopathy and polyneuropathy.  On June 2006, Dr. Padveen reported that because of his significant left ankle problems, Plaintiff was scheduled for further surgery in July 2006.  Plaintiff also continued to experience discogenic low back pain with radiculopathy.  In August 2006, Dr. Padveen noted that Plaintiff's left ankle and foot were "purple/blue."  AR 920. MRI scans performed in October 2006 revealed disc protrusion and mild grade one retrolisthesis at L5-S1.  After noting continued low back pain and radiculopathy in November and December 2006, and January 2007, Dr. Padveen sought authorization for back surgery.

Following back surgery in February 27, 2007, and re-exploration due to a hematoma on March 15, 2007, Plaintiff's radiculopathy had practically resolved by April 2007.  Neurosurgeon Serge Obukhoff, M.D., Ph.D., opined that Plaintiff was "doing well" and referred him for aquatic therapy.

Plaintiff again had back surgery on May 21, 2007, following discovery of fluid collecting around the nerve root.  On June 7, 2007, Dr. Obukhoff noted that Plaintiff's leg pain was completely relieved and he was fully ambulatory.  The doctor projected that physical therapy would begin in about four weeks.

On July 26, 2007, Plaintiff complained of low back pain and tingling in his left foot.

On September 13 and October 11, 2007, Dr. Padveen noted that despite progress in aquatic therapy, Plaintiff still experienced low back and ankle pain.

In November 2007, Dr. Obukhoff noted that Plaintiff's back pain and radiculopathy had improved greatly following his second nerve root decompression surgery, but that problems with his left foot continued to decrease his mobility and recovery.  At about the same time, Dr. Padveen noted left ankle pain with prolonged weight bearing although lower back pain and radiculopathy had improved.

In January 2008, Dr. Padveen noted that Plaintiff had ankle, back, and neck pain as well as lower leg spasms when walking. A helical CT scan of Plaintiff's lumbar spine on January 25, 2008 noted "marked uncovertable joint degenerative changes with hypertrophy" with marked or significant stenosis at L4-L5 and L5-S1.  AR 346.

On February 2008, one year after Plaintiff's lumbar fusion, Dr. Obukhoff reported that Plaintiff was finally in "good stable condition."  AR 298.  Plaintiff reported a 50 percent improvement in his back pain, although he still experienced tingling and occasional sharp pains in his left foot.  Describing Plaintiff as having unlimited range of motion in his foot and good strength, Dr. Obukhoff predicted that Plaintiff would continue to improve with time.  Dr. Padveen also noted gradual improvement in Plaintiff's lumbar spine, despite reduced range of motion of the left lower extremity.

By April 2008, Plaintiff had experienced three lumbar spine surgeries.  Dr. Obukhoff noted continued tenderness over the lumbar spinous processes, restricted range of motion, and palpable spasms of the lumbar spinal musculature.  Physical therapy produced slight benefit.  Dr. Obukhoff recommended aquatic therapy.  Dr. Padveen noted lumbar spine pain with radiation into the left leg and tingling toes.

In a neurosurgical follow-up report dated May 8, 2008, Dr. Obukhoff wrote:

> [Plaintiff] had surgery performed more than a year ago which required re-exploration for persistent radiculopathy.  He still feels some numbness in his left foot, particularly when he puts weight on the foot.  His back pain has basically resolved.  I want to obtain another CT scan of the lumbar spine to evaluate the fusion site.  I will see the patient again in my office with the results.  Otherwise, he is noted to be ambulating very well, and except for this mild persistent radiculopathy, he has done very well overall.  His back pain is not an issue.

AR 277.

On May 15, 2008, Dr. Padveen noted continued low back pain with leg radiation and tingling toes.

In a June 2008 report of a CT scan of Plaintiff's lumbar spine, radiologist Ronald S. Grusd, M.D., DABR, DABNM, reported no remarkable findings regarding L1-L2, L2-L3, or L3-L4.  Arthritic changes were noted in the facet joints of L4-L5.  Dr. Grusd noted radiopaque screws at L5.  L5-S1 was fused on the left, with radiopaque apparatus noted within the disc.  There was a 2-3 mm. posterior disc bulge/osteophyte formation as well as encroachment of the epidural fat and foramina.  The traversing and exiting nerve roots were compromised bilaterally, but more compromised on the left.  Although the left facet joint was fused, arthritic changes were noted in the right facet joint.  The

sacroiliac joints were open and displayed a vacuum phenomenon.  Dr. Padveen observed myospasms and severe loss of range of motion of Plaintiff's lumbosacral spine; Plaintiff complained of moderate-to-severe pain there.

Later in June 2008, Dr. Obukhoff noted that although Plaintiff still complained of residual mild lower back pain and tingling in his leg, the intensity of pain was dramatically reduced.  Plaintiff was fully ambulatory with no apparent weakness in his foot.

In July 2008, Dr. Padveen noted that Plaintiff was severely depressed.

Because of Plaintiff's recent high blood pressure, pain, and difficulty sleeping, internist Sean Leoni, M.D., QME, examined Plaintiff in September 2008.  Dr. Leoni diagnosed borderline hypertension and insomnia, and prescribed Ambien and Norco.  After he performed an echocardiogram on September 17, 2008, Dr. Leoni added a prescription for dandarocine cream.

On September 15, 2008, orthopedist Brian S. Grossman, M.D., performed an orthopedic consultation requested by the workers' compensation carrier.  Plaintiff complained of "constant left-sided tingling low-back discomfort that is rated as an 8 out of 10," and "left buttock and posterior left thigh pain that is also tingling and is rated as a 7 out of ten."  AR 403.  Plaintiff had no corresponding right-side pain.  Pain was provoked by bending forward or sustained standing.  Plaintiff reported depression, but no insomnia or anxiety.

Dr. Grossman observed that, although Plaintiff slowly rose from seated to standing, he stood with level shoulders and no list.  Lumbar lordosis and thoracic kyphosis were normal.  Gait was also normal.  Plaintiff could walk on his heels and toes without observed deficits.  Plaintiff's range of lumbar motion was reduced to 25 percent in lumbar extension, right lateral flexion, and left lateral flexion.   His motor strength was 5/5 for left and right hip flexors, quadriceps, tibialis anterior, ankle dorsiflexors, great toe extensor, ankle plantarflexors, and right extensor hallucis longus.  Strength of the left extensor hallucis longus was 4+.  Straight leg raise was normal except for the left supine straight leg raise, which was positive at 30°.  Plaintiff's lumbosacral midline was tender, but his paralumbar muscles, right sciatic notch, and left sciatic notch were not.  Left and right leg lengths and calf and thigh circumferences were equal.

///

Dr. Grossman diagnosed (1) status post posterior lumbar interbody fusion with instrumentation L4-L5 with residual left neural foraminal stenosis; (2) residual left lateral recess stenosis L5-S1; (3) status post left ankle surgery (11-28-2005), and (4) history of cervical and thoracic strains.  He opined:

> [T[he postoperative CT scan reveals findings that suggest a successful fusion but there may be residual stenosis on the left at both the operative level as well as the disc space distal to that.  At this point, I suggest proceeding with a postoperative lumbar MRI with and without contrast to more fully evaluate the possibility of residual neural foraminal stenosis.  The patient's postoperative CT scans were performed without intrathecal contrast and are difficult to interpret.  If postoperative MRI reveals findings that suggest either a failure of the fusion or residual stenosis, then revision surgery may be indicated.

AR 408.

MRI scans performed on October 5, 2008, revealed post-operative changes and facet degeneration changes at L4-L5.

In October 2008, Dr. Padveen referred Plaintiff for a surgical consultation, noting continued lumbosacral pain with radiation to the left leg.  Orthopedist Munir M. Uwaydah, M.D., QME, provided a comprehensive orthopedic medical evaluation on November 21, 2008.  Dr. Uwaydah reported that Plaintiff experienced constant slight-to-intermittent moderate-to-occasionally-severe low back pain that radiated to both lower extremities, which was severe in the left lower extremity and moderate in the right.  Plaintiff's lower extremities also were numb, tingling, and weak.  Prolonged walking, standing, or sitting increased the pain.  Plaintiff experienced difficulty bending, stooping, squatting, twisting, and turning.  Pain disturbed his sleep.

Examination revealed tenderness and spasm over the paraspinal muscles, quadratus lumborum muscles, and gluteal joints bilaterally.  The straight leg raise was positive on both sides.  Plaintiff's lumbar range of motion was decreased to 30° flexion,

0º extension, 10º right side bending, and 10º left side bending.  Motor strength was 4/5 for all lower extremity muscle groups bilaterally.  Plaintiff walked with a limp.  Dr. Uwaydah diagnosed pseudoarthritis and painful hardware, and recommended lumbar spine fusion revision surgery.

On December 10, 2008, Dr. Leoni diagnosed hypertension and failed back syndrome.  Plaintiff refused medication for hypertension.

A January 28, 2009 CT-lumbar spine post myelogram indicated a solid fusion, postlaterally and to the left of L4-L5.  A bony overgrowth and moderate foraminal narrowing on the left indicated a possible impingement responsible for Plaintiff's symptoms.  The report also indicated mild overall canal stenosi at L3-L4 and the transitional level at L5-S1.

In a February 2009 progress report, Dr. Leoni diagnosed hypertension and failed back syndrome.  Attempting to lose weight, Plaintiff continued to refuse medication for high blood pressure.

On February 25, 2009, Dr. Grossman reviewed Plaintiff's January CT scans and myelogram.  Plaintiff continued to complain of severe and intractable low back pain, which radiated down his left leg.  Plaintiff's lumbar range of motion was reduced and painful.  Dr. Grossman suggested that Plaintiff's left leg pain was attributable to residual stenosis on the left at L4-L5.

But in March 2009, characterizing Plaintiff as a "healthy appearing male in no acute distress" (AR 515), Dr. Grossman noted that Plaintiff could rise from seated to standing without difficulty, and demonstrated no focal motor deficits in his lower extremities.  Although his gait and station were normal, his lumbar range of motion was restricted with pain at the edges of the range.  Review of a CT/myelogram showed

///

successful interbody fusion at L4-L5 with no evidence of stenosis requiring additional decompression.

Also in March 2009, Dr. Uwaydah reported that Plaintiff continued to experience constant slight back pain, radiating to the lower extremities, with intermittent moderate pain and occasional severe pain.  Pain increased with prolonged standing, walking, or sitting.  Plaintiff had difficulty bending, stooping, squatting, twisting, and turning, but walked normally.  He reported difficulty sleeping due to pain.

On April 23, 2009, industrial physician Craig Chanin, M.D., examined Plaintiff and cleared him for back surgery, opining that he was a "healthy adult male."  Plaintiff denied anxiety, depression, or insomnia.  A week later, consulting physician Richard S. Niemeyer, M.D., diagnosed hypertension, pseudoarthritis, and malpositioning of hardware at L5-S1.

Dr. Uwaydah performed back surgery on April 30, 2009.  By this time, Plaintiff was taking medication to control his hypertension.  On May 5, 2009, Plaintiff was admitted to Valley Presbyterian Hospital for inpatient rehabilitation.  On May 21, 2009, Dr. Padveen noted that Plaintiff "w[ore] his support belt and ambulate[d] slowly."  AR 502.

In July 2009, Dr. Leoni noted that Plaintiff's back pain was better and his blood pressure was under control.  In August 2009, Dr. Leoni noted that aquatic therapy was helping Plaintiff.  In September 2009, Plaintiff complained to Dr. Leoni of back pain radiating to his legs.

In July 2009, Dr. Padveen diagnosed restless leg syndrome.  In September 2009, Plaintiff complained to him of tingling and pinching pain in the left leg and foot.

In August 2009, Dr. Uwaydah reported that Plaintiff walked with an antalgic gait.  His pain level was 7/10; walking and weight bearing made the pain worse.  Plaintiff felt rejected and anxious, and requested medication for his moods.  Straight leg raise and sitting root tests were positive.  Lumbar range of motion was limited.  Dr. Uwaydah restricted Plaintiff to lifting no more than five pounds; no repetitive bending, stooping, twisting, or turning; no prolonged standing or sitting longer than twenty minutes.  He added that Plaintiff must have always the ability to sit or stand at will.

From December 2009 through September 2010, Plaintiff continued monthly visits to Dr. Leoni, who monitored his blood pressure and medication.

On December 24, 2009, orthopedist John Simmonds, M.D., performed a consultative examination for the state agency.  Plaintiff did not appear to be in acute or chronic distress.  He moved around the office freely without assistance, was able to get on and off the examining table, and could assume a supine position without assistance or difficulty.

Dr. Simmond's palpation of Plaintiff's cervical spine revealed no tenderness, increased muscle tone, or muscle spasm.  Plaintiff demonstrated the range of motion of his cervical spine actively and voluntarily, revealing no limitations.  In contrast, the lumbar spine range of motion was painful and limited. Straight leg raising was negative, but pain occurred with elevations over 50 degrees in the supine position.  Fine touch and vibrational sensation was decreased in the lower left extremity but did not occur with a dermatomal pattern.

Dr. Simmonds diagnosed discogenic disease of the lumbosacral spine; status post anterior posterior laminectomy, discectomy, and fusion; status post removal of hardware; and status post re-implantation of hardware currently with failed back

12

syndrome.  He opined:

> Based on today's examination, it is the examiner's opinion from an orthopaedic standpoint that the claimant is able to push, pull, lift, and carry 20 pounds occasionally and 10 pounds frequently.  Walking and standing can be done for six hours per day.  No assistive device is required for ambulation.  Postural activities, i.e. bending, kneeling, stooping, crawling, and crouching can be done on an occasional basis.  Agility, i.e. walking on uneven terrain, climbing ladders, or working at heights can be done on an occasional basis.  Sitting can be done for six hours a day, given the pathology of his lower back.  Fine and gross manipulative movements can be done without restrictions.

AR 981.

On January 16, 2010, psychiatrist Jarvis B. Ngati, M.D., conducted a consultative examination for the agency.  Dr. Ngati concluded that Plaintiff had major depressive disorder, mild to moderate, aggravated by moderate psychosocial stressors including poor finances, unemployment, and chronic medical problems.  He estimated Plaintiff's global assessment of function to be 69.[3]  Dr. Ngati opined:

> Based on today's examination, the claimant is capable of handling his own funds. The claimant's ability to perform simple and repetitive tasks is not limited.  His ability to perform detailed and complex tasks is not limited.  His ability to relate and interact with coworkers and the public is not limited.  His ability to accept instructions from supervisors is not limited.  His ability to maintain concentration, attention, persistence, and pace is mildly limited by his anxiety and depression symptoms.  His ability to perform activities without special or additional supervision is not limited.  His ability to deal with the usual stressors encountered in the workplace, maintain normal attendance, and complete a normal workday or workweek is not limited.

AR 987.

On April 28, 2010, neuropsychologist Daniel R. Freeman, Ph.D., QME, ABPM, and clinical psychologist Daniel J. King, Psy.D., signed a 109-page agreed medical

---

[3]     The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of a psychiatric diagnosis.  American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Test Revision 2000) (DSM IV TR).  An individual's GAF score contemplates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." excluding "impairment in functioning due to physical (or environmental) limitations."  *Id.* at 34.
        GAF 69 is near the top of the range 61-70 which indicates "[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.* at 34.

examination in psychology.  Their extensive report consists largely of accounts of Plaintiff's physical and psychological treatment with relatively less of the report reflecting Drs. Freeman and King's testing and examination of Plaintiff for workers' compensation disability assessment purposes.

Drs. Freeman and King's testing consistently produced extreme results.  Plaintiff's performance on the word memory test (WMT) was below the cut-off range on both immediate and delayed word memory, indicating that Plaintiff was attempting to feign or exaggerate memory impairment.  Results of the Test of Memory Malingering (TOMM) also suggested that Plaintiff attempted to exaggerate or over report psychological or physical symptomology.  Results on the Minnesota Multiphasic Personality Inventory (MMPI-II) revealed an inconsistent response style, severe exaggeration of psychiatric and somatic complaints, and gross exaggeration that rendered test results invalid for interpretation.  Plaintiff scored in the 5th percentile, or borderline impairment range, on the Wechsler Adult Intelligence Scale (WAIS-III).  Results of the Millon Clinical Multiaxial Inventory III "indicate[d] a broad tendency to magnify the level of experienced illness or perhaps a characterological inclination to excessively complain." AR 1228.  Results of the Wahler Physical Symptoms Inventory indicated that Plaintiff reported "a marked degree of physical symptoms relative to a male psychiatric population." AR 1229.  The Beck Depression Inventory II placed Plaintiff in the severe range of subjective depression; the Beck Anxiety Inventory placed Plaintiff in the severe range of subjective anxiety.

Drs. Freeman and King diagnosed Plaintiff as having depressive disorder not otherwise specified, which was chronic and mild-to-moderate.  They found no personality or developmental disorders.  The doctors noted that Plaintiff had vocational

///

and health concerns, concern about his son's psychological issues, and marital discord. They determined Plaintiff's GAF to be 62.[4]

Drs. Freeman and King considered eight factors of disability in reaching their determination of disability for workers' compensation purposes.  They concluded that although Plaintiff's intellectual functioning was within the average range and his language skills were sufficient, the fatigue resulting from the pain and anxiety that disrupted his sleep impaired Plaintiff's higher-order attention and concentration.  His ability to perform complex or varied tasks was very slightly impaired.  Plaintiff's ability to perform simple and repetitive tasks was not impaired.  Plaintiff's depression slightly impaired his ability to maintain work pace appropriate to a given work load.  Plaintiff's depression and irritability slightly impaired his ability to engage in social and other interpersonal relationships.  Plaintiff's pain and functional limitations resulted in a very slight-to-slight impairment of his ability to make decisions, evaluations, judgments or generalizations without immediate supervision.  The doctors recommended that the workers' compensation insurer provide Plaintiff with 12 to 18 sessions of industrially related psychotherapeutic treatment to address his depression and sleep difficulties.

On January 20, 2010, orthopedist Chester A. Hasday, M.D., prepared a medical-legal evaluation as part of Plaintiff's workers' compensation claim.  Plaintiff's complaints included (1) constant dull aching pain and stiffness of the neck, radiating to the upper back and bilateral shoulders, but not into the arms, with intermittent headaches; (2) constant upper back tenderness and stiffness radiating from the neck and worsening with significant neck pain; (3) constant moderate-to-severe left-sided low back pain radiating

---

[4] GAF 62 is near the bottom of the range 61-70 which indicates "[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.* at 34.

into the left buttock and down the lower left extremity to the foot and toes, causing

difficulty walking and bending at the waist; (4) constant radiating leg aching and tingling

from the left buttock into the left thigh and on into the foot, with pain on the bottom of

the left foot and stabbing pains in the toes; and (4) constant dull aching left ankle pain

which became constant sharp pain with prolonged walking and standing or inclement

weather.  Dr. Hasday performed a physical examination and administered multiple tests,

noting that Plaintiff did not make full effort on the Lumbard Test, which measures

isometric extensor strength.

Following his review of Plaintiff's medical history, treatment, examination, and

treatment records, the doctor recorded his impressions:

> 1.      Chronic recurrent musculoligamentous injury cervical spine and trapezious muscle.
> 2.      Minimal degenerative disc disease C3 through C6 per MRI 10/14/07. There is no evidence of cervical radiculopathy or peripheral nerve entrapment in either upper extremity.
> 3.      Chronic recurrent musculoligamentous injury lumbar spine.
> 4.      Status post lumbar spine surgery x 4 (date of surgery one, 02/27/07, left transformational L5-S1 discectomy interbody fusion; date of surgery two, 03/05/07, re-exploration, evacuation postsurgical hematoma; date of surgery three, 05/21/07, re-exploration, lysis of adhesions L5-S1 nerve roots; date of surgery four, 04/30/09, re-exploration, re-anterior/posterior fusion L5-S1 with bilateral laminectomy, foraminotomies L4-5 with postsurgical evidence of a solid L5-S1 arthrodesis and chronic stable left L5-S1 radiculopathy.
> 5.      Status post arthroscopy/arthrotomy left ankle x 2 (date of surgery one, 11/28/05, underwent arthroscopy/arthrotomy, removal of loose bodies, exostectomy anterior distal tibia with synovectomy; date of surgery two, 07/23/06, repeat arthroscopy, synovectomy left ankle with evidence of chronic early tibiotalar arthritis.

AR 1079.

After assessing percentages of disability in accordance with workers'

compensation practices, Dr. Hasday opined that Plaintiff was restricted to light work and

should avoid prolonged periods of sitting.  Because of his left ankle condition, Plaintiff

was precluded from prolonged standing and walking, repetitive climbing of stairs or

ladders, and walking on uneven or irregular terrain.

On January 22, 2010, consulting neurologist and psychiatrist Richard J. Shork, M.D., diagnosed chronic cervical and lumbar myoligamentous strains and sprains; status 4 post-operative spine surgeries with fusion; failed back syndrome; neuropathic left leg pain, aggravated by Valsalva; status 2 post-operative left heel and ankle surgeries; and insomnia.  He deferred evaluation of Plaintiff's consequential anxiety and depression to psychiatric experts.  Dr. Shork noted: "The patient is argumentative regarding his medications.  I have advised that he decrease his Vicodin and increase his gabapentin but he prefers not to."  AR 1019.

E.L. Gilpeer, M.D., prepared the physical residual functional capacity assessment on behalf of the agency on January 28, 2010.  Relying on Dr. Simmond's examination findings, Dr. Gilpeer concluded that Plaintiff's symptoms were attributable to a medically determinable impairment but that the severity or duration of the symptoms was disproportionate to the expected severity or the expected duration based on Plaintiff's medically determinable impairments.

On February 1, 2010, S. Jacobson, M.D., completed the psychiatric review technique.  Dr. Jacobson concluded, based on findings within the record, that Plaintiff's impairment was not severe.

Orthopedist Todd Moldawer, M.D., re-examined Plaintiff and reported to the workers' compensation insurer in connection with a modification of Plaintiff's treatment plan on April 15, 2010.  Dr. Moldawer diagnosed (1) chronic lumbo-sacral strain; (2) status 4 post multiple lumbar surgeries; (3) status post anterior and posterior fusion at L4-5 with residual foraminal stenosis at L4-5 on the left; (4) active L4 radiculopathy on the left by report; and (5) transitional segment anomaly of the lumbosacral junction.  He

17

opined that Plaintiff's prognosis was poor and that further surgery would be necessary.

On June 28, 2010, Plaintiff underwent a foraminotomy at L4-5 on the left and removal of retained hardware, which significantly improved his left leg symptoms. Thereafter, Plaintiff developed septicemia.  As a result, on July 31, 2010, Plaintiff was admitted to Valley Presbyterian Hospital for CT-guided aspiration of the incision.  On August 30, 2010, Dr. Grossman performed an emergency exploration of the incision. Plaintiff was also treated by an infectious disease specialist, Dr. Jerrold Dreyer.  But by the time of a follow-up examination with Dr. Moldawer on September 7, 2010, Plaintiff was feeling well.

Dr. Moldawer's treating physician report dated October 12, 2010, reported that Plaintiff was able to walk without limp or weakness, and to stand on his heels and toes without difficulty.  He observed no motor or sensory deficits in Plaintiff's lower extremities.  Straight leg raise was mildly positive on the right at 90 degrees.  No further diagnostic studies were needed.  Plaintiff was referred for aquatic physical therapy and limited to light work.  On November 16, 2010, Dr. Moldawer reported that Plaintiff continued to progress and could begin land-based physical therapy.

Plaintiff again saw Dr. Ortiz for chiropractic treatment on October 14, 2010.  Dr. Ortiz noted reduced paraesthetic symptoms in Plaintiff's right foot and reported that Plaintiff's back pain continued.  On December 1, 2010, Dr. Leoni reported stiffening of Plaintiff's lower back and tingling of Plaintiff's feet.

On December 22, 2010, radiologist Sean Johnson, M.D., reported that an MRI of Plaintiff's left shoulder indicated minimal acromioclavicular osteoarthritis and subchondral cysts within the humeral head.  A cervical spine MRI revealed 1-2 mm. posterior disc bulges at C3 to C6 without evidence of canal stenosis or neural foraminal

narrowing.

Philip H. Conwisar, M.D., conducted a comprehensive orthopedic consultation on February 15, 2011.  Dr. Conwisar reported that Plaintiff's left shoulder demonstrated positive impingement and Hawkins test.  Compared to Plaintiff's right shoulder, strength and range of motion was reduced on the left.  Dr. Conwisar diagnosed impingement syndrome, left shoulder, rule out rotator cuff tear.  After reviewing the December 22, 2010 MRI of Plaintiff's shoulder, Dr. Conwisar ruled out a rotator cuff tear and recommended shoulder surgery.

On February 27, 2011, Plaintiff was treated for back pain in the emergency room of Antelope Valley Hospital.

On March 24, and May 12, 2011, Dr. Padveen noted frequent left shoulder pain aggravated by use or activity at or above shoulder level, and continued back pain radiating to the left foot.  He referred Plaintiff for pain management evaluation.

On May 18, 2011, anesthesiologist Narinder S. Grewal, M.D., conducted a pain management consultation.  Plaintiff complained of intractable low back pain, rated 9/10, radiating across both buttocks and groins, and radiating all the way down to the left foot.  Plaintiff reported weakness, numbness, and tingling throughout his lower left extremity.  Pain worsened with more than 15 to 20 minutes of sitting, standing, or walking, and with increased activity including climbing, pushing, pulling, and turning.  Plaintiff's left leg buckled after walking more than a block.  Plaintiff also complained of pain in both shoulders and headaches.

Dr. Grewal diagnosed (1) left lumbosacral radiculitis with neuro claudication; (2) status post multiple lumbar surgeries; (3) failed conservative therapies, including physical therapy, chiropractic treatments, anti-inflammatory medications, muscle relaxants, and

narcotic pain medication; (4) restless leg syndrome; (5) lumbar neuropathy; and (6) anxiety, depressions, and insomnia.  He recommended lumbar epidural steroid injections, prescription of Lyrica and Xanax, and continued physical therapy and chiropractic treatments.

Dr. Grewal administered epidural steroid injections on May 23, and June 3, 2011.  On June 3, 2011, the doctor noted excellent pain relief from the injections combined with prescription medication.

Dr. Hasday conducted an agreed medical re-examination on July 8, 2011.  His impressions were largely unchanged except to reflect two additional spinal surgeries, for a total of six surgeries, since his prior report.  His report focused largely on Plaintiff's left shoulder impingement.  Dr. Hasday characterized the loss of motion in Plaintiff's left shoulder as "a compensible consequence of [Plaintiff's] last two low back surgeries and post-op rehab."  AR 1521.  He referred Plaintiff for left shoulder arthroscopic surgery.  Characterizing his prior determination that Plaintiff's condition was permanent and stationary as having been premature, he found Plaintiff to be temporarily totally disabled.

The doctor noted that Plaintiff wore a firm plastic back brace, or "turtle shell," that permitted him to sit for longer periods and to drive for long distances.

In response to Dr. Hasday's questionnaire concerning his activities of daily living, Plaintiff reported that self-care activities were uncomfortable and done slowly.  He could lift only light objects, could walk only short distances, could climb stairs with a lot of difficulty, and could push or pull only very light objects.  Kneeling, bending, and squatting presented a lot of difficulty.  Plaintiff was unable to perform forceful activities with his hands and arms.  His sleep was "completely disturbed."  AR 1538.  He was unable to travel.  Since his injury, his ability to type was unchanged, his ability to see and

write was mildly changed, and his ability to hear was moderately changed.

Pain was fairly severe most of the time and interfered with his ability to think and concentrate a lot or most of the time: in the past week, reported Plaintiff, his pain averaged 9/10, with a high rating of 10/10.  The pain caused moderate depression or anxiety most of the time.

Plaintiff reported that he could sustain light activity for two minutes.  He could sit, stand, and walk for less than 15 minutes at a time.  Reaching and grasping at chest level presented some difficulty, but reach and grasping overhead presented a lot of difficulty.  He could grip, grasp, hold, and manipulate objects with some difficulty. Repetitive motions, such as typing at a computer, presented a lot of difficulty.

In his July 27, 2011 report, Dr. Grewal reported that Plaintiff then received prescriptions for Topamax, Prilosec, Norco, and Xanax, without evidence of complications, addiction, or diversion.  Dr. Grewal recommended further lumbar epidural injection and home exercise.  Plaintiff received lumbar epidural injections on August 3, and October 5, 2011.

**Vocational expert.**  Randi Hetrick testified as vocational expert.  She opined that Plaintiff's job had been closest to auto body repairer (DOT 807.381-010, SVP 7, medium), but did not include all the responsibilities within that job description.  As Plaintiff performed the job, it was SVP 3 or 4, with lifting of 35 to 40 pounds.

For the first hypothetical question, the ALJ directed Ms. Hetrick to assume a 48-year-old worker with a third-grade education, who was able to lift and carry ten pounds occasionally and less than ten pounds frequently; to stand and walk two to four hours in an eight-hour period; to sit six hours in an eight-hour period but needed to reposition himself every thirty minutes without leaving his work station; to occasionally use stairs

and ramps, but never use ladders, ropes, or scaffolds; to occasionally balance or stoop, but never kneel, crouch, or crawl; to reach or work overhead with his right arm occasionally.  The hypothetical individual must avoid even moderate exposure to hazardous machinery and unprotected heights.  He was also psychologically limited to simple routine repetitive tasks of low stress with only occasional changes in work setting, but was capable of frequent contact with the public and co-workers.  Ms. Hetrick opined that such a worker was both physically and psychologically unable to perform Plaintiff's past work.  He could perform assembly, sorting, or inspection jobs at the sedentary level, however, such as lampshade assembler (DOT 739.684-039, SVP 2, sedentary) with 5000 jobs locally and 50,000 jobs nationally; touch-up inspector (DOT 732.684.062, SVP 2, sedentary) with 1200 jobs locally and 24,000 jobs nationally; or button reclaimer (DOT 734.687-042, SVP2, sedentary) with 1000 jobs locally and 20,000 jobs nationally.

For the second hypothetical question, the ALJ added that the individual would be limited to occasional gross manipulation with his non-dominant upper left extremity.  Ms. Hetrick opined that such an individual could not perform any of the jobs identified in the first hypothetical question.

The ALJ then directed Ms. Hetrick to assume the same individual described in the first hypothetical question except that he was limited to only occasional reaching and working overhead.  She opined that such a person could perform the sedentary jobs identified in the first hypothetical question.

Plaintiff's attorney then asked whether the answer would differ if the hypothetical individual required a sit-stand option.  Ms. Hetrick opined that the person could continue to perform sedentary work if he only needed to shift position, but that if he needed to first sit for some time, and then to stand for some time, he could not perform sedentary work.

*///*

## II.   **Discussion**

### A.   **Legal Standards**

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:      Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:      Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:    Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:     Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:     Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

23

Plaintiff had acquired sufficient quarters of coverage to be insured through March 31, 2010. Accordingly, to be eligible for a period of disability and disability benefits, Plaintiff had to establish disability on or before March 31, 2010.[5]

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 25, 2005, through his last insured date of March 31, 2010.  His severe impairments included status post lumbar fusion, lower back pain, left shoulder impingement syndrome, left ankle pain, and depression.  None of these severe impairments met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926).  Plaintiff was capable of performing the sedentary work as defined in 20 C.F.R. § 416.967 (a), except that he could lift and carry ten pounds both occasionally and frequently; stand and walk two to four hours in an eight-hour period; sit six hours in an eight-hour period, repositioning every 30 minutes; occasionally climb stairs, or ramps, balance, or stoop;  never climb ropes or ladders, kneel, crouch, or crawl; occasionally reach bilaterally with his upper extremities; have no moderate [*sic*] exposure to dangerous machines or unprotected heights; perform simple, routine, and repetitive tasks; work in a low-stress environment with occasional changes in work setting; and frequently interact with the public and with co-workers.  Plaintiff could not perform his past relevant work.  The ALJ concluded that jobs that Plaintiff could perform existed in significant numbers in the national economy.

**B.     Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S.

---

[5]  Plaintiff was not eligible to receive supplemental security income ("SSI").

389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C.   **Plaintiff's Credibility**

Plaintiff contends that the ALJ erred in rejecting Plaintiff's testimony regarding his pain and limitations.  The Commissioner counters that the ALJ did not err in rejecting Plaintiff's contention that he was unable to perform any work.  Having reviewed the administrative record in its entirety in light of applicable law, the Court agrees with the ALJ that Plaintiff's account of his pain and functional limitations was not fully credible.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Indeed, he or she is prohibited from granting disability benefits solely because of a claimant's subjective complaints.  20 C.F.R. § 404.1529(a).  But if an ALJ decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints.  *Ceguerra v.*

*Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).  *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

"[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9[th] Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.*

26

Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see also Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Plaintiff argues that the ALJ's decision was not supported by substantial evidence and evinced legal error. The Commissioner and this Court disagree. In a nearly five-page discussion, the ALJ carefully reviewed the medical evidence included in the record and Plaintiff's claims of excessive pain and other symptoms, emphasizing Plaintiff's testimony regarding his limitations. *See* AR 20-AR 24. The ALJ then summarized:

I cannot find greater functional limitations or total disability based on the subjective complaints because they are not fully credible. The claimant's subjective complaints are out of proportion to the objective clinical findings and observed functional restrictions as noted above. There is no evidence of severe disuse muscle atrophy that would be compatible with his alleged inactivity and inability to function. The claimant is able to ambulate without an assistive device. In addition, the claimant's activities of daily living support the finding that he is not disabled. The claimant stated that his daily activities include walking around his home for a long period of time in the morning, watching television, attending to light chores such as washing dishes. He also takes walks in the afternoon accompanying his wife to buy groceries, attends church, and walks around the park by his home. The claimant stated that he goes fishing with his son. He is able to dress and bathe himself although it has been difficult and is able to go out by himself.

AR 25.

"An ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A). *Fair*, 885 F.2d at 603. "[I]f a claimant is able to spend a substantial part of his day engaged in

pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Id. (emphasis omitted).*  The ALJ's conclusion that Plaintiff's claimed limitations lacked credibility were legally appropriate and supported by substantial evidence.

### D.    **Residual Functional Capacity Analysis: Physical Impairments**

Plaintiff contends that the ALJ erred in failing to conclude that Plaintiff was physically disabled based on Dr. Hasday's conclusion, for workers' compensation purposes, that Plaintiff was temporarily totally disabled.  The Commissioner responds that because Dr. Hasday's opinion addressed an issue reserved to the Commissioner, the ALJ did not err in rejecting it.  The Court agrees that the ALJ was not bound by Dr. Hasday's opinion.

An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tommasetti*, 533 F.3d at 1041; S. S. R. 96-5p.  This includes determinations based on the California Guidelines for Work Capacity.  *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  "Workers' compensation disability ratings are not controlling in disability cases decided under the Social Security Act, and the terms of art used in the California workers' compensation guidelines are not equivalent to Social Security disability terminology."  *Booth v. Barnhart*, 181 F.Supp.2d 1099, 1104 (C.D.Cal. 2002)

"The categories of work under the Social Security disability scheme are measured quite differently" than determinations under the California workers' compensation system.  *Desrosiers*, 846 F.2d at 576.  A determination of temporary total disability, for workers' compensation purposes, "means that an individual is 'totally incapacitated' and 'unable to earn any income during the period in which he is recovering from the effects of the injury.'"  *Booth*, 181 F.Supp.2d at 1103 n. 2, *quoting Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600, 605 (9th Cir. 1996).  "A period of temporary total disability 'is that period when the employee is totally incapacitated for work and

during which he may reasonably be expected to be cured or materially improved with proper medical attention.'" *Id., quoting W.M. Lyles Co. v. Workmen's Comp. Appeals Bd.*, 3 Cal.App.3d 132, 136 (1969). Temporary and total disability contrast with a doctor's determination that the condition of the workers' compensation claimant is permanent and stationary, that is, that "'the employee has reached maximum medical improvement or his or her condition has been stationary for a reasonable period of time.'" *Id.* at 1104 n. 3. An opinion that an individual is temporarily totally disabled for workers' compensation purposes does not mean that the individual is thereafter precluded from returning to all work. *Kamiyama v. Astrue*, 293 Fed.Appx. 435, 437 (9th Cir. 2008).

That workers' compensation determinations are not controlling on the ultimate issue of disability does not mean that an ALJ can ignore the report of the physician making the determination. *Macri v. Chater*, 93 F.3d 540, 543-44 (9th Cir. 1996). On the other hand, the ALJ was not required to give Dr. Hasday's opinion controlling weight, nor did his workers' compensation determination conclusively establish Plaintiff's entitlement to Social Security benefits. *Booth*, 181 F.Supp.2d at 1108. So long as he did not overlook the differences of terminology and philosophy of the California workers' compensation and social security rating systems, the ALJ only needed to analyze Dr. Hasday's opinion in light of the factors applicable to all medical opinions in the administrative record. *See Booth*, 181 F.Supp.2d at 1105.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5)

29

specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. §
404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who
treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant
(examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant
(nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally
entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and
an examining physician's opinion is generally entitled to more weight than that of a non-examining
physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over
that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is
employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*,
812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as
to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747,
751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the
Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions
are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the
uncontradicted opinion of a treating or examining medical physician only for clear and convincing
reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the
treating physician's opinion is generally given greater weight, when it is contradicted by an
examining physician's opinion that is supported by different clinical findings the ALJ may resolve
the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a
detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence,
and make a finding.  *Magallanes*, 881 F.2d at 751-55.

In his capacity as an agreed examiner for workers' compensation, Dr. Hasday, an orthopedist, was an examining physician.  He twice examined Plaintiff and offered his opinion on Plaintiff's physical condition and ability to perform work: on January 20, 2010, and on July 8, 2011. He opined that Plaintiff was temporarily and totally disabled in his second opinion, more than fifteen months after Plaintiff's eligibility for disability benefits ended on March 31, 2010.  In January 2010, Dr. Hasday opined that Plaintiff was permanent and stationary, and capable of light work as that term is defined under state workers' compensation law.

The first indication of Plaintiff's having shoulder problems appears in Dr. Johnson's report that an MRI of Plaintiff's left shoulder revealed minimal acromioclavicular osteoarthritis and abnormalities in the humeral head.  Dr. Conwisar diagnosed left shoulder impingement on February 15, 2011.  Dr. Hasday's subsequent conclusion that Plaintiff was temporarily totally disabled by left shoulder impingement and required surgery hardly controls the determination of whether Plaintiff was disabled on or before March 31, 2010, the end of his eligibility for disability insurance benefits.

With regard to the physicians' opinions, the ALJ did precisely what is required by law: consider the record as a whole, considering each physician's opinion in light of the opinions of the other physicians, with due regard for the nature of the treating relationship and the relevant factors set forth in 28 C.F.R. § 404.1527(d).  An ALJ need do no more than consider opinions rendered in the context of workers' compensation proceedings just as he or she would evaluate any other medical opinion. *Booth*, 181 F.Supp.2d at 1105; *Mejia-Raigoza v. Astrue*, 2010 WL 1797245 at *8 (E.D. Cal. May 3, 2010) (No. 1:09-cv-00441-DLB).  As is evident from the extensive factual background set forth above, the administrative record includes extensive medical treatment records spanning over six years and recording the opinions of over twenty medical professionals.  Contradictory opinions were inevitable in light of the numerous opinions and examinations over a protracted period in which Plaintiff's condition and primary complaint changed multiple times.  The hearing decision

acknowledged the complexity of the administrative record, setting forth an unusually detailed and thoughtful analysis.  Ultimately, although the record arguably could have supported several different outcomes, the ALJ 's determination was based on substantial evidence.  Nothing more was required.

**E.     Residual Functional Capacity Analysis: Mental Impairment**

Plaintiff argues that the ALJ failed to recognize that, unlike the Social Security definition, Dr. Freeman's opinion that Plaintiff had a slight impairment in his ability to maintain an appropriate work pace meant that Plaintiff's impairment was noticeable.  The ALJ's failure to comprehend the nature of the workers' compensation terminology, argues Plaintiff, in turn rendered the hypothetical questions to the vocational expert inadequate.  The Commissioner counters that by limiting Plaintiff to simple, routine, and repetitive work in a low-stress environment, the ALJ sufficiently addressed Plaintiff's limitations of pace.

Contrary to the assessment of agency physician, Dr. Jacobsen, the ALJ found Plaintiff's depression to be a severe impairment, with mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in concentration, persistence, and pace, but no extended episodes of decompensation.  He noted that Dr. Freeman had reported that Plaintiff had mild-to-moderate depression, and "very sight impairment in his ability to comprehend and follow instructions, maintain an appropriate work pace, relate to other people, very slight impairment in his ability to perform complex or varied tasks, and no impairment in ability to perform simple repetitive tasks."  AR 24. In contrast, said the ALJ, Dr. Ngati opined that Plaintiff had "no limitations in his ability to perform simple and complex work, interact with others, and accept instructions from supervisors, and deal with usual stressors in the workplace, and mild limitations in concentration, attention, persistence, and pace."  AR 24.

Thus, giving more weight to Dr. Freeman's opinion, and giving Plaintiff "the benefit of the doubt," the ALJ limited Plaintiff to simple repetitive tasks, a low stress environment permitting

occasional changes in work setting, and frequent interaction with the public and co-workers.  AR 24.

His hypothetical questions to the vocational expert incorporated these considerations.  Since the ALJ

failed to articulate Plaintiff's limitation of pace and to incorporate it into his hypothetical questions to

the vocational expert, Plaintiff contends that this Court should reverse the Commissioner's decision

and award benefits.

Generally, an ALJ's hypothetical questions to a vocational expert must incorporate all of the

claimant's limitations and restrictions.  *Magallanes*, 881 F.2d at 756.  Nonetheless, the Ninth Circuit

has drawn an exception when the expert opinion clearly indicated that the claimant was capable of

performing a specific type of work even though he or she also had limitations in attention,

persistence, or pace.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008).

In *Stubbs-Danielson*, the ALJ found that "the claimant retains the residual functional capacity

to perform routine, simple, repetitive sedentary work, requiring no interaction with the public."  *Id.*

Ms. Stubbs-Danielson argued that the ALJ's omission of her deficiencies in pace constituted error.

*Id.*  Agreeing with the Sixth (*Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) and Eighth (*Howard*

*v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)) Circuit Courts, the Ninth Circuit held that an ALJ's

determination that a claimant's residual functional capacity limited him or her to "simple tasks"

adequately contemplated deficiencies in concentration, persistence, or pace.  *Stubbs-Danielson*, 539

F.3d at 1174.

The Ninth Circuit opinion emphasized the language of the medical opinion in which

the "state psychologist's findings . . . . concluded that the claimant, despite certain pace

deficiencies, retained the ability to do simple, repetitive, routine tasks."  *See id.* at 1174,

*citing Howard*, 255 F.3d at 582.  In this case, Dr. Ngati opined that Plaintiff's "ability to

perform simple and repetitive tasks is not limited" even though  "[h]is ability to maintain

concentration, attention, persistence, and pace is mildly limited by his anxiety and depression

symptoms." AR 987.  Similarly, Drs. Freeman and King opined that Plaintiff retained the

ability to perform simple and repetitive tasks despite a reduction in his ability to maintain the

pace of work, impacting his productivity.  AR 1296-AR 1297.

Elsewhere, the Ninth Circuit has characterized this question as a dichotomy between

specific limitations and concrete work restrictions.  *See, e.g., Israel v. Astrue*, 494 Fed.Appx.

794, 796 (9th Cir. 2012); *Rogers v. Commissioner of Social Security Admin.*, 490 Fed. Appx.

15, 18 (9th Cir. 2012); *Yasuda v. Commissioner of Social Security Admin.*, 473 Fed.Appx.

787, 788 (9th Cir. 2012); *Sabin v. Astrue*, 337 Fed.Appx. 617, 620 (9th Cir. 2009).  When the

concrete work restrictions incorporate one or more specific limitations, the ALJ does not err

in phrasing his determination of the claimant's residual functional capacity or his

hypothetical questions to a vocational expert using the concrete work restrictions.

**F.    Listing 1.04A**

Plaintiff contends that the ALJ erred in failing to determine that he met the requirements of

20 C.F.R. Part 404, Subpt. P. App. 1, Listing 1.04A.  The Commissioner counters that Plaintiff met

the requirements of the listing only for brief periods before several of his lumbar spine surgeries.

The Court agrees that since Plaintiff did not establish the requisite loss of function for the required

duration, he did not establish the elements of the listing.

Listing 1.04A provides:

1.04    *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis,
spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
fracture), resulting in compromise of a nerve root (including the cauda equina) or the
spinal cord, With:
A.    Evidence of nerve root compression characterized by neuro-anatomic
distribution of pain, limitation of motion of the spine, motor loss (atrophy with
associated muscle weakness or muscle weakness) accompanied by sensory or reflex
loss and, if there is involvement of the lower back, positive straight-leg raising test
(sitting and supine).

34

A claimant's diagnosis is not the sole criterion for determining whether he or she meets the listing criteria.  "The statute generally defines 'disability' in terms of an individualized, functional inquiry into the effect of medical problems on a person's ability to work."  *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990).  "The mere existence of an impairment is insufficient proof of disability."  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  A plaintiff bears the burden of producing medical evidence establishing the existence of an impairment, its severity, and how it affects the plaintiff's functioning.  20 C.F.R. § 404.1512 (c).

All musculoskeletal disorders included within 20 C.F.R. Part 404, Subpt. P. App. 1, Listing 1.00, require that the claimant's condition result in loss of function.  20 C.F.R. Part 404, Subpt. P. App. 1, Listing 1.00 B.1.  "Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment."  20 C.F.R. Part 404, Subpt. P. App. 1, Listing 1.00 B.2.a.  The claimant's inability to ambulate effectively must have lasted or be expected to last at least 12 months.  *Id.*

> Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit effective ambulation without the use of a handheld assistive device(s) that limits the functioning of both lower extremities.

20 C.F.R. Part 404, Subpt. P. App. 1, Listing 1.04A.2.b.

Since, consistent with the administrative record, the ALJ found that Plaintiff did not require an assistive device of any kind to ambulate, Plaintiff did not meet this requirement.  Plaintiff's own testimony revealed his ability to function well in his daily routine except for his inability to bend

forward.  Further, as the ALJ noted, Plaintiff did not exhibit the muscular atrophy that would be expected from his extreme representation of his physical condition.

Ultimately, in the context of his analysis of Plaintiff's residual functional capacity, the ALJ's assessment of Plaintiff's functional abilities was determined by the lack of credibility of Plaintiff's subjective complaints as contrasted with extensive objective medical reports and Plaintiff's daily activities.  Separately analyzing Plaintiff's functional abilities at step three would not have yielded a different result: Plaintiff simply did not demonstrate the requisite loss of function for the requisite statutory period to meet the requirements of Listing 1.04A.

**III.    Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **February 25, 2014**              **/s/ Sandra M. Snyder**
                                                    UNITED STATES MAGISTRATE JUDGE